IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ALASKA

GREAT DIVIDE INSURANCE   )
COMPANY,                 )
                         )
            Plaintiff,   )
                         )
v.                       )
                         )
TODD CHRISTIANSON, and   )
d/b/a Great Alaska Lawn  )
and Landscaping, Inc.; and )
Keith Jones,             )
                         )
            Defendants.  )
_____)

Case No. 3:06-cv-00060 TMB

DEPOSITION OF MICHAEL W. DENNIS

November 16, 2006

APPEARANCES:

   FOR THE PLAINTIFF:         MR. MICHAEL W. FLANIGAN
                               Walther & Flanigan
                               Attorneys at Law
                               1029 West Third Avenue
                                Suite 250
                               Anchorage, Alaska 99501
                               (907) 279-9999

   FOR DEFENDANT CHRISTIANSON: MR. KEVIN T. FITZGERALD
                               Ingaldson, Maassen & Fitzgerald
                               Attorneys at Law
                               813 West 3rd Avenue
                               Anchorage, Alaska  99501
                               (907) 258-8751

Exhibit 4
Page 1 of 10 Pages

Page 2

```
 1              TABLE OF CONTENTS
 2    Direct Examination by Mr. Fitzgerald        04
 3    Cross Examination by Mr. Flanigan           41
 4    Redirect Examination by Mr. Fitzgerald      49
 5    Recross Examination by Mr. Flanigan         54
 6  EXHIBITS MARKED:
 7  1 - Application; March 31, 2003               19
 8  2 - Application; March 25, 2003               27
 9  3 - Correspondence; CHI and Superior Underwriters  29
10  4 - Notice of Occurrence/Claim                34
11  5 - Renewal General Liability Policy RE Great Divide  38
12  6 - Vehicle Registrations                     55
13
14
15
16
17
18
19
20
21
22
23
24
25
```

Page 3

```
 1            PROCEEDINGS
 2       (Anchorage, Alaska - 11/16/2006)
 3       (On record)
 4       REPORTER: My name is Wanda Ventres. I'm a Notary Public
 5  in and for the state of Alaska representing Computer Matrix
 6  Court Reporters at 310 K Street in Anchorage, Alaska. Today's
 7  date is November 16th, 2006, and the time is 2:00 o'clock p.m.
 8  We are at the offices of Ingaldson, Maassen and Fitzgerald at
 9  813 West 3rd Avenue in Anchorage to take the deposition of Mike
10  Dennis in a United States district court case for the state of
11  Alaska, Great Divide Insurance Company, plaintiff, versus, Todd
12  Christianson, et al, defendants, case number 3:06-cv-00060 TMB.
13       Counselors, if you would identify yourselves for the
14  record, please, then I will administer the oath.
15       MR. FLANIGAN: Mike Flanigan for Mr. Jones.
16       MR. FITZGERALD: Kevin Fitzgerald on behalf of Todd
17  Christianson. And just for the record, Mr. Holmes, who
18  represents Great Divide, who I believe noticed the deposition,
19  at the last records deposition indicated that he was not going
20  to be here but waived his appearance at this particular
21  deposition.
22       REPORTER: All right. Thank you. And, Mr. Dennis, would
23  you raise your right hand.
24       (Oath administered)
25       MR. DENNIS: Yes.
```

Page 4

```
 1       REPORTER: You may lower your hand.
 2            MICHAEL W. DENNIS
 3  having first been duly sworn under oath, testified as follows
 4  on:
 5            DIRECT EXAMINATION
 6       REPORTER: And for the record state your full name and
 7  spell your last name, please.
 8  A   Michael W. Dennis, Junior, D-E-N-N-I-S.
 9       REPORTER: And a mailing address, please.
10  A   Should I give my work or home?
11       REPORTER: Work is fine.
12  A   507 West Northern Lights Boulevard, Anchorage, 99503.
13       REPORTER: And a daytime telephone number.
14  A   (907) 276-7667.
15       REPORTER: Thank you. You may proceed.
16       MR. FITZGERALD: Thank you.
17  BY MR. FITZGERALD:
18  Q   Mr. Dennis, I'm going to ask you questions first. Mr.
19      Flanigan has an opportunity to ask some questions as well.
20      But I think that I -- I'll ask mine first. I'm
21      anticipating less than an hour here. But if at any time
22      during the -- the time we're asking questions if you need
23      to take a break for any reason, just tell us and we'll go
24      off record. Okay?
25  A   Okay.
```

Page 5

```
 1  Q   Have you ever had your deposition taken before?
 2  A   Yes.
 3  Q   Okay. I -- I won't then go through the normal rules.
 4      But if you don't understand a question, please have
 5      me rephrase it because I'll -- I'll consider that you
 6      have understood the question if -- if you answer it.
 7      Okay?
 8  A   (No audible response)
 9  Q   And another thing, because this is being recorded you have
10      to.....
11  A   Yes.
12  Q   .....answer audibly to all the questions. Can you just
13      tell me how long you've worked for CHI?
14  A   May of '91.
15  Q   And is CHI a broker, insurance broker?
16  A   Yes.
17  Q   And how long have you been in that line of business?
18  A   May of '91.
19  Q   Did you take any special training or receive any special
20      training prior to the time that you started with CHI?
21  A   No.
22  Q   Okay. And after you began with CHI did you go
23      through any kind of training seminars or classes with
24      regard.....
25  A   Yes.
```

Computer Matrix, LLC          Phone - 907-243-0668    Exhibit 4
310 K Street, Suite 200       Fax    907-243-1473    Page 2 of 10 Pages   jpk@gci.net
                                                                         hile@gci.net

Page 6

1 Q Okay. And can you just briefly describe what those
2   were?
3 A I have my CIC, Certified Insurance Counselor, five
4   classes that you take.
5 Q And when did you receive your CIC?
6 A I don't remember.
7 Q Okay. Would it have been shortly after May of '91?
8 A No. It was sometime after that, a few years after
9   that.
10 Q Okay. Have you received any other degrees or
11   certifications other than the CIC?
12 A No.
13 Q Okay. And apart from the five classes have you
14   received any additional education or training?
15 A Update classes; you have to take one a year.
16 Q Okay. And that's required by regulation or statute?
17 A Well, it's required to keep your CIC and then the
18   state, you have to have 20 hours of continuing
19   education every two years or something to keep your
20   insurance license current.
21 Q And so is the 20 hours the one course a year that you're
22   talking about or.....
23 A One course and then I think four additional hours.
24 Q Independent of what's required by the state is -- is
25   anything additional required by your employer?

Page 7

1 A No.
2 Q Okay. And are you an employee of CHI or are you a
3   consultant or independent contractor?
4 A An employee.
5 Q And can you -- just generally describe for us -- let's
6   take the situation I'm a client and let's say I'm involved
7   in general contracting. I want to buy some insurance.
8   Can you describe what the procedure is by the time they
9   come in and talk to you? Can you just briefly describe
10   what the -- the procedure is?
11 A Procedure to.....
12 Q What would be the process? I want to place insurance. I
13   come to you because you're an insurance broker and I want
14   the coverage for my business.
15 A Yes, we would, you know, find out what you're doing.
16   You'd inform us what you're doing. And -- and then we'd
17   make application to some insurance companies to get a
18   quote.
19 Q And are there particular insurance companies that CHI is
20   -- is either in contract with or are there particular
21   insurance companies that CHI employs or uses?
22 A Yes.
23 Q Okay. And is that by agreement or contract or is
24   that just preference?
25 A You know, that's something you'd have to ask Paul

Page 8

1   honestly.
2 Q Okay.
3 A I don't know that.
4 Q And when you say ask Paul, that would be Paul Houston?
5 A Houston, yes.
6 Q Okay. And is he your boss?
7 A Boss, he owns CHI.
8 Q Okay. All you know is that rather than perhaps pursuing
9   every possible insurance companies, there would be typical
10   insurance companies that would be used by CHI to place
11   insurance?
12 A Yes.
13 Q Okay. And is it -- is it ever the situation where
14   CHI will attempt to place insurance with a particular
15   insurer that CHI may typically use and for whatever
16   reason that insurer, either the customer doesn't like
17   that insurer or the -- that insurer won't -- won't
18   insure the customer that you seek insurance
19   independent of -- of that arrangement?
20 A I don't understand the question.
21 Q Okay. You indicated that based on your experience that --
22   that there were kind of a group of insurers that CHI would
23   typically go to. Is it ever the situation where, for
24   whatever reason, that group of insurers is not employed
25   and -- and CHI seeks to place the insurance with somebody

Page 9

1   independently?
2 A I -- I still -- the lines are crossed there for me
3   between what you mean by seek to independently
4   or.....
5 Q Has there -- let me ask it this way, has there ever been a
6   situation in which you've attempted to place insurance for
7   a customer and the typical insurers that CHI would employ
8   couldn't be used?
9 A Yes.
10 Q Okay. And is that a relatively rare occasion that that --
11   that occurs?
12 A Yes.
13 Q And has it -- on those particular occasions has it
14   been predominantly because the client didn't want to
15   place insurance there or that the insurance company
16   couldn't place the insurance with the -- or couldn't
17   insure the client?
18 A The insurance company couldn't or wouldn't.
19 Q Right, okay. Is there ever a situation where among the
20   pool of insurers that CHI places insurance with that you
21   do comparative shopping among the insurers?
22 A Yes.
23 Q In this particular case I see that CHI placed
24   insurance for Todd Christianson and his company,
25   specifically Titan Enterprises, LLC, and Titan

MICHAEL DENNIS                11/16/2006              GREAT DIVIDE v. CHRISTIANSON
Vol. 1                                                3:06-CV-00060

4 (Pages 10 to 13)

Page 10

1   Topsoil; is that right?
2 A Yes.
3 Q And that the insurance that was placed was worker's comp,
4   auto and GL?
5 A Yes.
6 Q Do you recall whether there was any comparative shopping
7   at the time that you became involved, any comparative
8   shopping of any insurers in order to place insurance for
9   Christianson and his companies?
10 A No.
11 Q Okay. Now you indicated that -- and I see from the
12   documents and -- and I might just add that when Mr.
13   Houston was here he indicated that -- that there were
14   some additional documents that needed to be produced
15   and -- and since he appeared there's a stack of
16   probably 15 hundred or more pages of documents. If
17   you know, are there additional documents that aren't
18   included in -- in those documents that have been
19   provided to counsel?
20 A I'm not aware.
21 Q Okay. I -- I notice that there is a relationship
22   with Superior Underwriters. And can you describe
23   generally what -- what the purpose of that
24   relationship is and what that relationship does?
25 A Yes. Superior is a wholesale broker and we present

Page 11

1   insurance to them and then they use the companies that
2   they are contracted with, or -- or whatever, to give us a
3   quote.
4 Q And is there some -- if you know, is there some agreement
5   or contract between CHI and Superior which would dictate
6   that Superior would be the -- the wholesale broker?
7 A That I don't know.
8 Q Okay. Have you ever placed insurance with another
9   wholesale broker besides Superior?
10 A Yes.
11 Q Okay. And who -- who and.....
12 A Alaskan General, Swift Crawford, American E&S; there are
13   others that I don't recall.
14 Q Okay. In the context in which the -- the business
15   context in which we're speaking here, which is
16   essentially as a general contractor in the areas of
17   excavation, landscaping, have you ever placed
18   insurance through another wholesale broker besides
19   Superior for like companies?
20 A I don't know.
21 Q Okay. Now you indicated that with regard to the process
22   that the process typically begins with you obtaining
23   information from a client. And I'm -- I'm -- you know who
24   I'm referring to when I talk about a client?
25 A Yes.

Page 12

1 Q Okay. And in this particular case when did the --
2   the relationship begin between you and Christianson
3   and his companies, if you remember?
4 A Sometime in '03.
5 Q And prior to that time you had had no relationship with
6   Christianson and/or his companies either with another
7   entity or individually on your own part?
8 A No.
9 Q And how is it that -- if you recall, how is it -- and I
10   know this is some years ago. How is it that the business
11   was brought to you?
12 A I believe Todd called.
13 Q Okay. And do you recall meeting with Todd in your office
14   or was it confined at least preliminarily to phone calls?
15 A I don't remember.
16 Q Speak to anybody else at -- with his companies, if you
17   recall?
18 A No.
19 Q Pauline Jackson or Kevin Thompson or.....
20 A I have had conversations with them but prior to that
21   I don't remember.
22 Q Okay. But the conversations you may have had was after
23   the initial kind of relationship had begun between you and
24   Christianson and his companies?
25 A I believe so.

Page 13

1 Q Okay. And do you know who the prior insurers or
2   frankly the -- the prior -- either the prior insurers
3   or the prior broker had been for Christianson and --
4   and his companies?
5 A No.
6 Q Okay. Prior to Titan Enterprises, LLC, and Titan
7   Topsoil did you have any idea when those companies
8   began?
9 A No.
10 Q Did you -- did you have any idea at the time when the
11   relationship started with Christianson what might
12   have been predecessor companies?
13 A Yes.
14 Q Okay. And what information did you have regarding
15   predecessor companies?
16 A Todd told me that he used to own Great Alaska Lawn and
17   Landscaping, I think is what it was called or something to
18   that effect, and that he -- he was changing the name.
19 Q Okay. And at that point then the companies that he spoke
20   to you about were Titan Enterprises and Titan Topsoil?
21 A Yes.
22 Q Okay. And did you understand or appreciate that there was
23   any distinction between Titan Enterprises, LLC, and Titan
24   Topsoil?
25 A No.

Computer Matrix, LLC              Phone - 907-243-0668                     jpk@gci.net
310 K Street, Suite 200           Fax     907-243-1473                     sahile@gci.net
                                                      Exhibit 4
                                                      Page 4 of 10 Pages

## Page 14

1  Q  Okay. Did -- do you recall Mr. Christianson speaking to
2     you about Titan Topsoil being really the topsoil end of
3     the -- this kind of general business and Titan Enterprises
4     being kind of the general contractor for excavation work
5     or landscaping work?
6  A  No.
7  Q  Okay. Did you -- during the course of obtaining
8     information from Christianson did you ever obtain any
9     of the prior policies?
10 A  No.
11 Q  Okay. At the time that you began working with --
12    with Christianson did you -- maybe -- let me ask it
13    this way, strike that. Let me -- let me ask it more
14    generally. What information did you obtain from
15    Christianson concerning his companies?
16 A  Again, it's been so long but I -- I can tell you
17    typically what we would do.
18 Q  Okay.
19 A  You know, I would have asked him for -- you know,
20    what he was doing. I ask him, you know, the payroll
21    for -- for the different scope of the work he was
22    doing and -- and submitted those to the -- to the
23    carrier.
24 Q  And do you recall -- do you recall what it is that -- that
25    Mr. Christianson indicated that his companies were doing?

## Page 15

1  A  Yes.
2  Q  Generally what -- what was it that was described to you?
3  A  They were doing landscaping and -- and manufacturing
4     topsoil.
5  Q  And did he provide you payroll records?
6  A  I believe so.
7  Q  Okay. And that would have been information that
8     would have been particularly important for a worker's
9     comp carrier?
10 A  Yes.
11 Q  Did -- do you recall ever inspecting the premises or
12    inspecting any property or assets that -- that the
13    companies might have held?
14 A  No.
15 Q  Do you recall inspecting any of the equipment that
16    might have been utilized with either Titan
17    Enterprises or Titan Topsoil?
18 A  No.
19 Q  Would that have been a typical part of your practice
20    in -- in obtaining information?
21 A  No.
22 Q  Do you recall at any point during your relationship
23    with Christianson being provided some information
24    concerning the equipment that was utilized by Titan
25    Enterprises or Titan Topsoil?

## Page 16

1  A  No.
2  Q  Are you familiar at all with a hydroseeder?
3  A  No.
4  Q  Okay.
5  A  I know what they are.
6  Q  Okay. And was it your understanding that -- that the
7     business that was described to you by Christianson
8     employed or utilized a hydroseeder?
9  A  Yes.
10 Q  And was that true at the time that the insurance was
11    placed?
12 A  Yes.
13 Q  Okay. And I take it that -- that when Christianson
14    contacted you about placing insurance on his behalf with
15    carriers that what his motivation, if you can speak to
16    that at all, would be that his operation would be covered?
17 A  I -- I -- I believe that it was in order for him to obtain
18    work he had to have the coverage, yes.
19 Q  Okay. And that that was the reason why he was contacting
20    you to place insurance with -- with carriers so that --
21    that what -- what he was doing would be covered?
22 A  Yes.
23 Q  That would be the standard -- you would expect that from a
24    customer or a client coming to you that that would be what
25    they would be seeking your -- your help.....

## Page 17

1  A  Yes.
2  Q  .....and assistance in providing; is that right?
3  A  Yes.
4  Q  Okay. And based on the information that was provided
5     to -- by Christianson to you, what -- do you recall
6     what insurance you placed for him and with what
7     companies?
8  A  Yes, I specifically remember the general liability
9     and the worker's comp. And the worker's comp was
10    with -- with AIG, American International Group, which
11    is a carrier in Alaska. And then the general
12    liability I wouldn't have remembered except that
13    we've talked about Great Divide handling the
14    insurance on that.
15 Q  And -- and what part would Superior have played with
16    regard to placing the insurance with any of those
17    companies?
18 A  That's who they put it with or that's who they sent me the
19    quote from, was through Great Divide.
20 Q  So the process would be that you get the information from
21    the client or the customer. You then convey that same
22    information to the underwriter who then is specifically
23    tasked with the -- with getting the insurance?
24 A  Correct.
25 Q  Okay. And did that -- was that process followed in

Page 18

1  this particular case?
2  A  Yes.
3  Q  Do you recall who it was from Superior that you might
4     have had direct contact with regarding placing the
5     insurance here?
6  A  No.
7  Q  And is Superior a local company or is it nationally
8     based?
9  A  I believe they're in Redmond, Washington.
10 Q  Did you -- apart from the payroll records that you made
11    some mention to, was there any examination of the books or
12    of the.....
13 A  No. And payroll records, we never receive payroll
14    records. I receive the information about how much payroll
15    he would have. I never looked at records.
16 Q  Okay.
17 A  We -- we presume the client to be trustworthy and
18    they give us that information. Later it's audited by
19    the insurance company but we never do that.
20 Q  I understand and -- and that would be -- with regard to
21    determining whether the payroll records matched the
22    premium paid for instance in the context of worker's comp,
23    that would be something that the insurance company would
24    be coming back.....
25 A  Correct.

Page 19

1  Q  .....to the client with and saying, hey, you know, your
2     operation costs more with regard to a premium.....
3  A  Correct.
4  Q  .....you need to pay up? Okay. If I can, I'd like to --
5     and let me just say I haven't reviewed all the documents.
6     I've reviewed about a third of the documents. And I'm
7     going to show you some applications. But it appears that
8     the applications that -- that I'm going to show you here
9     are all typewritten and none of them are signed by Mr.
10    Christianson. Do you recall that there actually was a
11    handwritten or a signed application by Christianson to
12    place the insurance?
13 A  Not handwritten; signed, yes.
14 Q  Signed, okay.
15    MR. FITZGERALD: Madame Court Reporter, do you have some
16 exhibit stickers for me?
17    REPORTER: Yes, I do. They're not numbered yet.
18    MR. FITZGERALD: I'll number those. Thank you.
19    REPORTER: If you need more, I have more.
20    MR. FITZGERALD: Great.
21 Q  I'm going to mark as Exhibit 1 what appears to be -- what
22    appears to be an application dated March 31, 2003. And do
23    you see that?
24            (Deposition Exhibit 1 marked)
25 A  Yes.

Page 20

1  Q  Okay. And is there -- is there any reason for you to
2     believe that the signed application differs in any
3     regard with regard of what's shown in Exhibit 1?
4  A  It -- it could differ, yes.
5  Q  Okay. And without comparing the two what would be your
6     belief with regard to how it might differ?
7  A  It might be a different day.
8  Q  Okay. But generally it would contain the same
9     information?
10 A  It should.
11 Q  Now with regard to the -- there is portions here with
12    regard to general information. And is there any effort
13    made on your part to verify any of that information?
14 A  Yes.
15 Q  Okay. And do you recall -- looking specifically at
16    Exhibit 1 do you recall verifying the information
17    contained in the category under general information?
18 A  Yes.
19 Q  And was there anything that was represented that was
20    misrepresented as far as -- as you were able to discern?
21 A  No.
22 Q  Now I -- I see on the second page that there's prior
23    carrier information. There doesn't appear to be any
24    of that filled out.
25 A  Correct.

Page 21

1  Q  And how would that have been reflected in your files that
2     there wouldn't have been any information or that -- you
3     know, that there was information forthcoming or why -- why
4     is this not filled out, if you know?
5  A  I understood Titan Enterprises to be a new entity.
6  Q  Okay. So where there might have been a prior carrier
7     or predecessor business, particular to Great Alaska,
8     there wouldn't have been based on your understanding
9     for Titan Enterprises or Titan Topsoil?
10 A  Yes.
11 Q  And then if you look at the fourth -- what appears to be
12    the fourth page in, there's an indication with regard to
13    schedule of hazards; do you see that?
14 A  Yes.
15 Q  And it indicates landscape, gardening, sand or gravel
16    digging, what -- what is the purpose of those -- listing
17    -- that -- those schedule of hazards in those codes?
18 A  That's what the insured -- client, insured, would have
19    told us that that's what they were doing.
20 Q  Okay. And then just a little above that, there's
21    coverages and limits. And was this information that you
22    had already obtained from Great Divide or.....
23 A  No.
24 Q  This was the request with regard to these were the
25    amounts that were being requested for the -- by the

Page 22

1  client to be insured?
2  A  Correct.
3  Q  And there's an indication here with regard to limits,
4     products and completed operations aggregate. What does --
5     what does that mean?
6  A  The products completed aggregate is the amount of
7     insurance that you would get in any year.
8  Q  And -- and specifically with regard to the term products,
9     what does that mean in your view?
10 A  A product that you manufacture or a completed operation,
11    toaster, the like.
12 Q  Now there's -- on the next page it talks about -- there's
13    subheadings for contractors, products, completed
14    operations, additional interests, general information.
15    And in the categories of -- for contractors, products, and
16    general information, there's all sorts of check marks or X
17    marks in the columns yes and no. Was there any
18    verification on your part with regard to the information
19    that -- that -- let me ask it this way, was this
20    information provided to you by the client?
21 A  Yes.
22 Q  And was there any attempt to verify any of the information
23    on this particular page?
24 A  No.
25 Q  Okay. And then there is towards the end of this --

Page 23

1     this particular exhibit, if you look at the last page
2     -- the last two pages, there appears to be an
3     equipment floater section. And that's dated the same
4     date, March 31, 2003. Would -- would that floater
5     have been part of the application or would that have
6     been a separate document or documents?
7  A  I -- it could have been part of it, yeah.
8  Q  Okay. And if you look at the scheduled equipment, which
9     is on the last page, and the scheduled equipment has item
10    number 13 is Bowie hydroseeder; do you see that?
11 A  Yes.
12 Q  And do you -- would this have been information -- I
13    see that there's an amount of insurance, $20,000.
14    Would this have been information provided to you by
15    the client or who -- who determines the amount of
16    insurance?
17 A  The client.
18 Q  Okay. And with regard to a Bowie hydroseeder I see
19    that there isn't an ID number or a serial number. Do
20    you -- let me ask it this way, do you recall seeing
21    this equipment floater?
22 A  No.
23 Q  Okay. Had -- had you -- and I take it from that that
24    you're not saying that you didn't see it?
25 A  I'm not saying I didn't see it, correct.

Page 24

1  Q  Okay. With regard to the Bowie hydroseeder, there isn't
2     any model year or number. Would it have been typically
3     your practice to try to ascertain the -- the year for the
4     equipment?
5  A  Yes.
6  Q  Okay. Do you recall whether there was any specific
7     inquiry on your part with regard to the year of the
8     Bowie.....
9  A  No.
10 Q  .....hydroseeder? And how about the ID and serial number,
11    that -- that information is omitted as well?
12 A  Yeah -- no.
13 Q  Okay. And in turn would this all have been information
14    that would have then been passed on to Superior
15    Underwriting to -- to place the insurance?
16 A  Yes.
17 Q  Okay.
18 A  This particular application is for physical damage
19    coverage though, not general liability.
20 Q  Okay.
21 A  Equipment floater would be to cover it for the loss of --
22    of -- because of vandalism, fire, that kind of thing.
23 Q  Okay. At the -- at the head page, March 31, 2003, it --
24    it looks like the -- it -- at the top of it it says
25    commercial insurance application; do you see that?

Page 25

1  A  Yeah.
2  Q  And then it indicates that it appears to be a commercial
3     general liability application. Would there have been a
4     separate insurance application for another type of
5     insurance?
6  A  No.
7  Q  Am I reading this incorrectly?
8  A  No. The -- the court application is what they use. This
9     -- this commercial insurance applicant information section
10    is the applicant information section. The -- the other
11    part here is the general liability section. And then the
12    last part would be the equipment floater that we looked
13    at. And that's again for the physical damage of the
14    vehicle, of -- of tools, equipment, that you have in your
15    shop.
16 Q  But all the information that -- that is now marked as
17    Exhibit 1 would have been information that would have been
18    passed on to the underwriter for purposes of placing the
19    insurance?
20 A  For purposes of placing the general liability insurance,
21    the last two parts would not have been part of that
22    application for general liability. That would have been
23    for different insurance.
24 Q  Okay. Do you if -- if -- did Superior Underwriting place
25    the insurance that placed worker's comp, general liability

Page 26

```
1     and auto?
2  A  No.
3  Q  Okay. Were they -- they were the -- the underwriting
4     for just the general liability?
5  A  Yes.
6  Q  Okay. So if I understand what you're saying with regard
7     to the equipment floater section, your belief would be
8     that that would have been placed with another insurance,
9     not general liability?
10 A  Correct.
11 Q  And would that have been the auto carrier?
12 A  No. It could have been a number of carriers that
13    would have insured equipment.
14 Q  Okay. Do you know whether -- do you have any idea whether
15    the equipment floater section was not provided to Superior
16    Underwriters?
17 A  No. It very well could have been.
18 Q  Okay. And regardless with regard to Superior
19    Underwriting, there's -- there's no question -- is there
20    any question in your mind that you received the
21    information with regard to the equipment floater?
22 A  No.
23 Q  Okay. Meaning that there's no question.....
24 A  No, no question.
25 Q  .....in your mind that you received it?
```

Page 27

```
1  A  No question.
2  Q  Okay. Let me show you what's been -- what's being marked
3     as Exhibit 2.
4              (Deposition Exhibit 2 marked)
5  Q  And it appears that this application is dated March 25,
6     2003. I -- I don't notice many changes in it and you're
7     free to examine or compare Exhibit 1 with Exhibit 2. But
8     what does appear to be different, apart from the equipment
9     floater, is on Exhibit 2 it appears that Exhibit 2 has a
10    more extensive list of scheduled hazards on page -- I
11    guess it's four. That in addition to the landscaping,
12    gardening, sand or gravel digging, there's excavation and
13    contractor executive supervisor; do you see that?
14 A  Yes.
15 Q  And do you have any memory of why it was that -- that
16    those two additional hazards weren't included in the
17    later dated application?
18 A  No.
19 Q  Okay. Do you recall having any specific conversation
20    with Todd Christianson or anybody in his office with
21    respect to that particular topic?
22 A  No.
23 Q  Okay. Do you have any guess with regard to how that
24    might have occurred?
25 A  Yeah, they -- they would have provided us with additional
```

Page 28

```
1     information regarding the additional classifications or
2     things that they weren't doing.
3  Q  Okay. Now it appears that you -- I asked you questions
4     previously about the limits and you talked about this idea
5     of products and completed operations aggregate of two
6     million dollars. Do you recall that series.....
7  A  Yes.
8  Q  And -- and based on the information that was provided
9     to you by Mr. Christianson did you believe that he
10    was actually producing products, widgets, if -- if
11    you will?
12 A  No.
13 Q  Okay. Would there have been any reason why he would
14    have needed products and completed operations
15    coverage?
16 A  Not that I'm aware of.
17 Q  Okay. And with regard to the general liability coverage,
18    is that -- is the products and completed operations
19    aggregate just a standard coverage within that packet of
20    general liability?
21 A  Yes.
22 Q  Okay. Are those -- are the coverages or the limits
23    here -- actually the coverages that are outlined
24    here, are those things that you can kind of tailor to
25    the specific needs of your business?
```

Page 29

```
1  A  I don't know how to answer that. It -- you can but it's
2     rare.
3  Q  And if it was more inclusive, you wouldn't have any
4     incentive as a client not to -- to reject coverages that
5     may not make any difference in the premium for instance?
6  A  Yes.
7  Q  Okay. And based on your experience does the premium
8     change or would it change if products and completed
9     operations aggregate coverage was included or excluded, if
10    you know?
11 A  If products was excluded, it may decrease the premium.
12 Q  Okay. And then if I can show you what's going to be
13    marked as Exhibit 3, and do you recognize that document?
14            (Deposition Exhibit 3 marked)
15 A  Yes.
16 Q  And is this -- is this the communication or
17    correspondence that -- that would have been between
18    CHI and Superior Underwriters concerning the
19    coverage.....
20 A  Yes.
21 Q  .....for general liability?
22 A  Yes.
23 Q  Okay. And does that indicate the premium charged for
24    the general liability policy?
25 A  Yes.
```

Page 30

1  Q   And I notice in the -- about two-thirds of the way
2      down the page there's an indication with regard to
3      exclusions.
4  A   Yes.
5  Q   And are those exclusions that the -- the client
6      requests or are those exclusions that Superior
7      Underwriters dictates?
8  A   Superior would send those exclusions. They may be
9      dictated by the carrier, not Superior.
10 Q   Okay. But in any event with regard to the source, it's --
11     it's not the client saying, hey, I don't want that.....
12 A   Correct.
13 Q   .....coverage?
14 A   Correct.
15 Q   And with regard to the exclusions, it includes an
16     exclusion for employee exclusion; do you see that?
17 A   Yes.
18 Q   What's your understanding of employee exclusion
19     coverage?
20 A   Employees aren't covered under general liability.
21 Q   Okay. And do you recall whether you had any specific
22     conversation with Mr. Christianson or any people in his
23     office concerning that particular exclusion that appears
24     to have been dictated by the policy he got?
25 A   No.

Page 31

1  Q   Okay. Would there have been any reason for you to
2      discuss that with Mr. Christianson?
3  A   No.
4  Q   And there's another exclusion for employment related
5      practices; do you see that?
6  A   Yes.
7  Q   And -- and what's that based on your experience?
8  A   Employment related practices is harassment,
9      discrimination, wrongful termination.
10 Q   And, again, the same series of questions, do you recall
11     having any specific conversation with Mr. Christianson or
12     members of -- of his office or staff concerning that
13     particular exclusion?
14 A   No.
15 Q   Do you know -- backtracking here to employee
16     exclusion, do you know whether -- let's say I'm a
17     general contractor. I'm doing, you know, landscaping
18     and sand and gravel digging and I want a general
19     liability policy. I come in to see you with regard
20     to the applicable or the appropriate coverages and I
21     -- I get back this Superior Underwriters exclusion
22     with regard to employee exclusion. Could I buy
23     independently employee exclusion coverage?
24 A   Not that I'm aware of.
25 Q   At least not in this jurisdiction?

Page 32

1  A   Correct.
2  Q   That you're aware of?
3  A   That I'm aware of.
4  Q   Okay. Now I notice that there's a separate exclusion
5      for terrorism; do you see that?
6  A   Yes.
7  Q   And actually on the very next page there's policy
8      disclosure notice of terrorism insurance coverage.
9      Is it your understanding that -- that despite this
10     exclusionary language that the terrorism coverage
11     either was mandated or -- or it was insurance that
12     ultimately Christianson and his companies obtained?
13 A   They could have.
14 Q   Okay. And what -- what is the purpose of the policy
15     disclosure notice of terrorism insurance coverage on
16     the second page of that exhibit that I've provided
17     you?
18 A   We have to provide that to the client to reject or elect
19     to have terrorism coverage.
20 Q   And is it your understanding that at some point during the
21     term of the coverage -- and what was the term of the
22     coverage for the GL policy; do you remember?
23 A   No.
24 Q   If it would have been some -- sometime -- and the date of
25     this particular document is April 17 and the applications

Page 33

1      we looked at previously were respectively March 25 and
2      March 31. Is it your understanding that the insurance
3      would have been placed shortly after the April 17th date?
4  A   Correct.
5  Q   So let's say that -- that -- and typically would that
6      be on an annual basis?
7  A   Yes.
8  Q   Okay. And is it your understanding that during the
9      course of that year that at some point terrorism
10     coverage was provided to Christianson and his
11     companies?
12 A   Yeah, he would have had to have signed this, mark
13     either reject or elect, and sign it.
14 Q   Now the -- the packet of -- Christianson came to you with
15     the idea that he needed to be covered. And you through --
16     through either general brokers or global brokers as well
17     as contacting specific carriers, placed insurance for him
18     of worker's comp, general liability and auto; is that
19     right?
20 A   Yes.
21 Q   And I -- I take it from your previous answers there
22     was no specific conversation with -- with Mr.
23     Christianson or members of his staff regarding any
24     other types of insurance?
25 A   Not that I remember.



Page 42

1  Q  Now the -- the -- I noticed in the application that
2     there's a reference to this particular hydroseeder, the
3     one that was involved in this accident. But there doesn't
4     seem to be any indication one way or the other in the
5     applications -- in the ones that I was looking at, whether
6     that was a loaned, leased, or borrowed piece of equipment.
7     And for instance just -- here's an example, there's --
8     this is in -- this is in the equipment floater section
9     that you may have seen already. This is -- I think that's
10    the page in front of it. So is there -- is there
11    someplace to put that kind of information on?
12 A  It says equipment rented, loaned, to or from others with
13    or without operators, general information.
14 Q  Yeah. You're referring to the front page?
15 A  Yeah.
16 Q  Okay. But these are -- these are not X'd off either way,
17    yes or no?
18 A  Right.
19 Q  So would that -- what does that tell us? Does that
20    tell us whether the -- the question just wasn't asked
21    or -- or what; what does that mean?
22 A  From my recollection there -- we weren't trying to obtain
23    coverage for those.
24 Q  Well, was there an equipment floater purchased?
25 A  Not that I'm aware of.

Page 43

1  Q  Because in the CGL it talks about property damage
2     insurance. Let me see if I can find that.
3  A  Right. Usually in reference to property damage, property
4     of others that you damage.....
5  Q  Okay.
6  A  .....when you're talking about general liability.
7  Q  How would -- how would the -- what was your understanding
8     of how the auto insurance would plug into the CGL? I mean
9     how would the two fit together in terms of -- of vehicles?
10    Because you -- you guys bought him -- you obtained the
11    auto insurance or the vehicle insurance through Cascade
12    Insurance Company I think?
13 A  Yes.
14 Q  So I mean I've seen a lot of CGL's where the -- where the
15    auto is included in the CGL. Was there some reason it was
16    broke apart here?
17 A  To my knowledge the auto is never covered under CGL.
18    It -- you can cover -- under the general liability
19    policy you can cover off-road equipment, equipment
20    that's not licensed for road use. A bulldozer, CAT,
21    excavator, those are all covered under a general
22    liability policy. But an auto policy covers vehicles
23    licensed for road use.
24 Q  Okay. Maybe I'm thinking of a package policy, where
25    you've got.....

Page 44

1  A  Yeah, a package policy, correct. But the auto and the CGL
2     are different coverages.
3  Q  Okay. Was there some reason that a package policy wasn't
4     sought in this particular matter or.....
5  A  I believe it couldn't be obtained.....
6  Q  Okay.
7  A  .....for Mr. Christianson.
8  Q  Is there -- some advantages and disadvantages to -- to
9     having separate policies versus a package policy?
10 A  There are advantages and disadvantages. My understanding
11    in the business that I do is that having it all with one
12    company, the coverage sometimes is seamless.
13 Q  Right, right.
14 A  When you have it with separate carriers, sometimes they --
15    they don't work together. But it can be cost. It can be
16    the client's record. There's many factors that go into
17    why it's separated.
18 Q  Okay. Is -- I haven't had a chance to review all these
19    materials yet. But -- but I -- in the -- in the activity
20    log, which starts in -- there's a couple of entries in
21    2000. Was there ever any coverage -- I mean was there any
22    coverage purchased for Titan Enterprises in 2000 because
23    there's just a couple of entries?
24 A  No.
25 Q  Okay. So that was just like an inquiry or something?

Page 45

1  A  I believe so. I believe somebody was marketing from our
2     office, looking for coverage.
3  Q  All right. So then -- so then in '03 it shows -- the
4     first entry says type of business, commercial lines
5     description, sent apps to Brian at Superior Underwriters.
6     And that's who was -- that's who it was ultimately placed
7     with, right?
8  A  Superior, correct.
9  Q  So was there any other insurers that -- that the apps were
10    sent to besides -- and I recognize that Superior's not an
11    -- an insurer. It's -- it's a commercial broker. But was
12    it -- was the app sent to anybody but Superior?
13 A  Not that I'm aware of.
14 Q  Okay. And does your company have some kind of an
15    agreement with Superior, agency relationship agreement?
16 A  I don't know that.
17 Q  Okay. Do you use other commercial brokers besides them?
18 A  Yes.
19 Q  Okay. Was it sent to anybody but Superior?
20 A  I -- I don't believe it was.
21 Q  Okay. And did Superior give you any -- any quotes on any
22    insurers besides Great Divide for the CGL?
23 A  As far as I know, no.
24 Q  Okay. Was there ever a request for a package policy
25    for Titan through Superior or through anybody else?